UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 19-10401-RGS

UNITED STATES OF AMERICA

v.

ROOSEVELT WILKINS

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

April 2, 2020

STEARNS, D.J.

Defendant Roosevelt Wilkins seeks to suppress a quantity of fentanyl seized in the aftermath of a traffic stop on Route 27 during the late afternoon of April 1, 2019. The following acts are drawn from Wilkins's supporting memorandum supplemented by facts offered by the government that are not in serious dispute.

1. Massachusetts State Police Troopers Michael Finley and Edward Alldredge observed a black 2018 Mercedes Benz sedan merge onto Route 27 from Route 24 without slowing or using the vehicle's left turn signal as it entered the right travel lane. The unsignaled merger caused drivers on Route 27 to brake to avoid a collision. The driver, who proved to be Wilkins, was also observed holding a cell phone in his hand "and was looking towards it as if he was texting." Def.'s Mem. (Dkt #38-1) Ex. A (Arrest Report). The troopers believed that Wilkins was texting in violation of the Massachusetts

motor vehicle operation laws and that he had failed to properly signal when leaving Route 24. Wilkins, by way of an affidavit, states that he was not "composing, sending, or reading an electronic message" on his phone. *Id. - Ex. B*. Wilkins does not deny failing to signal as he proceeded on to Route 27 but maintains that he did not change lanes in doing so.

2. The troopers approached Wilkins's car from opposite sides. Alldredge, who approached from the driver's side (there were no passengers in the vehicle), recognized Wilkins from a prior drug arrest in Bourne. He also knew Wilkins to be a member of Boston's Heath Street Gang and that Wilkins had a record of prior firearms arrests.

3. As Wilkins rolled down the car's window, Alldredge smelled what he believed to be the odor of burnt marijuana. When he asked Wilkins for his driver's license, Wilkin's produced the operator's license of a female friend. Questioned about the license, Wilkins replied "Oh, my bad," and produced his own license. *Id. - Ex. A*. When Alldredge asked Wilkins if he had been smoking marijuana, he denied having done so.

4. Alldredge ordered Wilkins to exit the vehicle. Wilkins complied, but as he did so, he shoved Alldredge in the chest and ran across four lanes of traffic on Route 27 dodging the flow of traffic. Alldredge took up the chase and drew his weapon, ordering Wilkins to drop to the ground. Wilkins eventually surrendered, but only after tossing an object under a parked car and jumping over a chain link fence. A passing motorist stopped and pointed

out to the troopers where Wilkins had thrown the object. It proved to be a bag of 16 fentanyl packets weighing some 78 grams.

5. Wilkins's Mercedes was towed and, pursuant to a written Massachusetts State Police policy, its contents were inventoried. The inventory search yielded a money counter and two cell phones, but no further drugs. The troopers subsequently obtained a search warrant for the contents of the cell phones. The search yielded evidence of drug dealing.[1]

## RULINGS OF LAW

1. A threshold inquiry is initiated by a stop; the resulting detention, however brief, is a seizure within the meaning of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968); *United States v. Cortez*, 449 U.S. 411, 417 (1981). That a person is stopped in a moving vehicle, or detained while sitting in a car, is irrelevant to the analysis. *Brendlin v. California*, 551 U.S. 249, 255-258 (2007); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *Adams v. Williams,* 407 U.S. 143, 147-148 (1972).

2. Under both federal and state law, a traffic violation, no matter how minor, and whatever may have been the subjective motivation of the officer, provides justification for a stop. *Whren v. United States*, 517 U.S. 806, 813

---

[1] Wilkins challenges the search of the cell phones as a "fruit of the poisonous tree," that is, as the tainted result of what he contends was an illegal detention. He does not otherwise contest the validity of the warrant. *See* Def.'s Mot. at 17 (Dkt #38).

(1996); *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1999) (failure to signal a lane change). *See also United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (*en banc*) (moving violation); *United States v. Johnson*, 63 F.3d 242, 247 (3d Cir. 1995) (same); *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (same); *United States v. Cummins*, 920 F.2d 498, 500-501 (8th Cir. 1990) (same).

3. While federal law governs, on the essential point of the propriety of an initial stop based on a traffic infraction, state and federal law are aligned. *See Commonwealth v. Moses*, 408 Mass. 136, 140 (1990). "We consistently have held that a stop is reasonable, and therefore constitutional, where an officer has observed a traffic infraction and, as a result, has actual cause to believe that the driver violated an applicable motor vehicle law. . . . We have applied this test, often referred to as the authorization test, without regard for the gravity or magnitude of the perceived violation." *Commonwealth v. Larose*, 483 Mass. 323, 326-327 (2019) (defendant observed to drift over the line demarcating the right fog line of the highway).

4. Simple mistakes of law and fact, if objectively reasonable, can provide justification for a traffic stop. *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) (officer reasonably believed that the state vehicle code required that a car be equipped with two working brake lights); *Commonwealth v. Rivas*,

4

77 Mass. App. Ct. 210, 215-217 (2010) (officer reasonably believed that a red rejection inspection sticker meant that the vehicle was being driven illegally).

5. If a vehicle stop is proper, officers may, at their discretion, order the driver to exit the vehicle while investigating. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (*per curiam*) (an officer, as a matter of course, with or without reasonable suspicion, may order a driver to exit his vehicle after a routine motor vehicle stop. The incremental intrusion on the driver's personal liberty resulting from the request to get out of the car once the vehicle is lawfully stopped "can only be described as *de minimus*" particularly "when balanced against legitimate concerns for the officer's safety."). *See also Maryland v. Wilson*, 519 U.S. 408, 413-415 (1997) (extending the rationale of *Mimms* to passengers).

6. Massachusetts law does not follow *Mimms* and is more protective of drivers (and passengers) when it comes to exit orders. *See Commonwealth v. Gonsalves*, 429 Mass. 658, 662 (1999) ("[A] police officer must, at least, have a reasonable suspicion of danger before compelling a driver to leave his motor vehicle."). The quantum of suspicion required, however, is quite low. "[T]he officer need point only to some fact or facts in the totality of the circumstances that create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the

scene in a more effective manner by ordering [the driver or] passenger to alight from the car." *Id.* at 665, quoting *State v. Smith*, 134 N.J. 599, 618 (1994). Knowledge of a suspect's reputation is among the factors often cited as the justification for an exit order. *See Commonwealth v. Amado*, 474 Mass. 147, 149-152 (2016) (defendant was known to have been arrested previously for illegal possession of a firearm in an automobile); *Commonwealth v. Ancrum*, 65 Mass. App. Ct. 647, 654-655 (2006), quoting *Commonwealth v. Torres*, 433 Mass. 669, 673 (2001) ("During a motor vehicle stop, the police are justified in ordering a driver or passengers to leave the car 'if they have a reasonable belief that their safety, or the safety of others, is in danger.' . . . Here, the police had a reasonable basis to believe that the occupants of the Cadillac had been involved in a recent shooting.").

7. Under Massachusetts law, there is no right to forcibly resist an illegal arrest or search. *See Commonwealth v. Moreira*, 388 Mass. 596 (1983). "[I]n the absence of excessive or unnecessary force by an arresting officer, a person may not use force to resist an arrest by one he knows or has good reason to believe is an authorized police officer, engaged in the performance of his duties, regardless of whether the arrest was unlawful in the circumstances." *Id.* at 601.

8. A legitimate expectation of privacy may be forfeited by voluntary acts

of abandonment. "Search or seizure of abandoned property, even without a warrant, is simply not unreasonable." *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1973). A disclaimer of ownership or the discarding of property may lend support to an objective finding of abandonment. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991) (fleeing suspect "tossed" a rock of cocaine); *United States v. Sealey*, 30 F.3d 7, 10 (1st Cir. 1994) (same, weapon and ammunition); *United States v. Brown*, 663 F.2d 229, 230 (D.C. Cir. 1981) (bag thrown into a bush). *See also Commonwealth v. Battle*, 365 Mass. 472, 475-476 (1974) (discarded drugs); *Commonwealth v. Nutile*, 31 Mass. App. Ct. 614, 619 (1991) (drugs thrown from a car during a police pursuit). While the issue of a defendant's subjective intent to abandon property is primarily a question of fact, whether his expectation of privacy in the allegedly abandoned property was reasonable is a matter of law for the court. *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995).

9. Even where a stop is found illegal, an intervening act or independent event may break the chain of causation and dissipate any taint – this is true even where a defendant's criminal act is precipitated by police misconduct. *See United States v. Sprinkler*, 106 F.3d 613, 619-620 (4th Cir. 1997) (resistance to an even unlawful arrest provides sufficient and independent grounds for a second arrest for a new and distinct crime); *United States v.*

*Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) (same); *United States v. Sheppard*, 901 F.2d 1230, 1234-1236 (5th Cir. 1990) (same); *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982) (*en banc*) (same); *United States v. Garcia*, 516 F.2d 318, 319-320 (9th Cir. 1975) (intervening flight). *Cf. United States v. Camacho*, 661 F.3d 718, 730 (1st Cir. 2011) (defendant's act of resisting arrest was not "intervening" where it took place after police discovered defendant's illegal firearm but noting the vigorous dissent of Judge Boudin). Massachusetts law is consistent with the majority rule that a defendant should not be permitted to invoke the exclusionary rule as a device for evading responsibility for his own misconduct. *See Commonwealth v. King*, 389 Mass. 233, 245 (1983) (driver attacked officers prior to the seizure of any evidence); *Commonwealth v. Saia*, 372 Mass. 53, 58 (1977) (same); *Commonwealth v. Kolodziej*, 69 Mass. App. Ct. 199, 203 (2007) (same, even an unjustified seizure "should not shield a defendant from arrest for any subsequent, unrelated offense he may commit"); *Commonwealth v. Mock*, 54 Mass. App. Ct. 276, 284 (2002) (an unprovoked assault on a police officer erases any taint as a matter of public policy).

10. The Fourth Amendment does not mandate the exclusionary rule. The rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a

personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974). "The exclusionary rule operates . . . to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect. . . . Where 'the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted.'" *Arizona v. Evans*, 514 U.S. 1, 10-11 (1995), quoting *United States v. Janis*, 428 U.S. 433, 454 (1976). "Suppression of evidence . . . has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

ULTIMATE CONCLUSIONS OF FACT AND LAW

The government cites two bases for the initial stop: a violation of Mass. Gen. Laws ch. 90, § 13H (texting while driving); and a violation of Mass. Gen. Laws ch. 90, § 14B (failure to signal).[2] Wilkins's principal objection to the

---

[2] The lane violation citation is one that cannot easily be resolved. As the government concedes, the appropriate citation would have been for a failure to yield to oncoming traffic as required by Mass. Gen. Laws ch. 89, § 9. There is, however, nothing in the police report to suggest that the officers had observed a yield sign violation. The government does submit as an attachment to its memorandum an unverified photograph of what appears to be a yield sign at the conjunction of Routes 27 and 24. Without an evidentiary hearing (although it may seem a minor point), the court is unable to rely on the government's memorandum alone as to the existence of the sign on the day in question and as to whether the troopers may or may not have observed it. I also have doubts about the government's argument that a merger from one thoroughfare onto another amounts to a "lane change"

9

stop is based on his denial (by affidavit) that he in fact was texting when the officers observed him looking at his cell phone while driving. He notes (correctly) that Massachusetts law at the time of the stop, while it banned texting while driving, did not forbid speaking on a cell phone while operating a motor vehicle. *See* Mass. Gen. Laws ch. 90, §§ 13, 13B (2010). Citing to *United States v. Paniagua-Garcia*, 813 F.3d 1013 (7th Cir. 2016), Wilkins urges this court to adopt the reasoning of the Seventh Circuit in addressing an Indiana statute nearly identical to the law then in effect in Massachusetts. Noting that the Indiana statute in question failed to outlaw any number of uses of a cell phone while driving other than texting, the Seventh Circuit concluded that a stop based on an "appearance of texting" fell within a swath of suspicion so broad that it "would permit the police to stop a substantial portion of the lawfully driving public." *Id.* at 1014-1015.[3]

---

under Massachusetts law.

[3] The Court panel blamed the Indiana legislature for the result. "Indiana is right to be worried about the dangers created by persons who fiddle with their cellphones while driving, but probably wrong to outlaw such fiddling only with respect to texting — if only because the effect of slicing up drivers' use of cellphones in this way has been to make the Indiana statute largely inefficacious, such is the difficulty of distinguishing texting from other uses of cellphones by drivers by glancing into the driver's side of a moving automobile." *Id.* at 1015.

While there is no First Circuit or Massachusetts case in point, I think the reasoning of the Seventh Circuit was sound.[4] I also, like Wilkins, perceive no substantive difference between the Indiana statute and the Massachusetts law as it existed at the time of the stop. Consequently, I will assume for present purposes that the troopers lacked the necessary quantum of reasonable suspicion for the stop of Wilkins's vehicle.[5]

But it is what happens next that decides the story. First, under the Fourth Amendment, the troopers did not require any reason of officer safety or a grounded suspicion that Wilkins was operating under the influence to order him out of his car. That issue was resolved adversely to Wilkins by the

---

[4] It is true, as the government points out, that a subsequent decision of the Seventh Circuit, *United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016), implicitly criticized the broad language of *Paniagua-Garcia*. The factual circumstances were, however, quite different. In *Miranda-Sotolongo*, while the officer was mistaken as to the requirements of Indiana law in displaying a temporary registration tag on a vehicle, he had also before the stop twice checked the relevant database and had found no evidence that defendant's vehicle was registered.

[5] That said, I agree with the government that there is no plausible allegation that the troopers were acting lawlessly or in bad faith in stopping Wilkins. I also agree that any mistake they may have made as whether Wilkins was in fact texting while staring at his cell phone was objectively reasonable and falls within the rule of *Heien*, 474 U.S. at 57. However, considering my ultimate conclusion, as will be explained, that any taint flowing from the stop was dissipated by Wilkins's acts of resisting arrest and abandonment, I do not rely on *Heien* alone.

Supreme Court in *Mimms*. Although that concludes the matter for present (federal) purposes, as the court's sixth ruling of law makes clear, the troopers' exit order passes muster under the more restrictive state constitutional rule as well. On exiting the vehicle, Wilkins, without submitting to custody, committed an unprovoked assault and battery on Trooper Alldredge and began to run to elude arrest.[6] For the reasons stated in the court's ninth ruling of law, the assault battery constituted an independent and intervening act that broke any chain of causation and dissipated any taint flowing from the initial stop. While I agree, as Wilkins suggests, that the First Circuit's *Camacho* decision sowed some confusion over the issue, the facts in that case were easily distinguishable as in *Camacho* the seizure of the firearm took place before, and not after, the attempt to resist arrest.[7]

---

[6] I acknowledge the government's cautionary concession that without an evidentiary hearing, it must accept Wilkins's assertion that a pat frisk occurred before the assault and battery took place. *See* Def.'s Aff. ¶ 6; Gov't's Mem. at 12 n.5 (Dkt #42). Like the government, I find the assertion implausible and likely based on Wilkins's recollection of what happened after Trooper Alldredge succeeded in running him to the ground. In any event, the right to frisk under the circumstances, given Wilkins's known gang affiliation and prior firearms offenses, was "immediate and automatic." *Terry*, 392 U.S. at 33 (Harlan, J. concurring). *See also United States v. Am*, 564 F.3d 25, 30 (1st Cir. 2009) (suspect's known gang affiliation and past criminal conduct justified his detention).

[7] Also, as Judge Boudin points out in his dissent, *Camacho* is, in several respects, in conflict with First Circuit precedent, notably *United States v.*

Moreover, for the reasons stated in the court's eighth ruling of law, any reasonable expectation of privacy in the contraband fentanyl (even assuming there could be one, *see Illinois v. Caballes*, 543 U.S. 405, 410 (2005)) was forfeited by Wilkins's tossing the bag of drugs under an anonymous parked car as he ran from the troopers. Wilkins's reliance on cases finding against abandonment where the alleged acts occurred while a defendant was in unlawful custody is inapt. As a matter of law (and fact), Wilkins's case is indistinguishable from *Hodari D.* In *Hodari D.*, the Supreme Court held that a defendant's escape from the clutches of an officer terminates any seizure. There is no "*continuing* arrest during the period of fugitivity" – thus, a defendant's acts after breaking away from police (such as the discarding of drugs) may give independent probable cause for a second arrest. *Hodari D.*, 499 U.S. at 625 (1991) (emphasis in original).

As a final point, I agree with the government's ultimate argument that, even assuming an unlawful vehicle stop, there is nothing so flagrant about the facts of this case to suggest a "first resort" to the exclusionary rule. See *Hudson*, 547 U.S. at 591.

## ORDER

For the foregoing reasons, the motion to suppress is <u>DENIED</u>.

---

*King*, 724 F.2d 253, 256 (1st Cir. 1984).

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE